## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:09-cv-445 |
| | ) | |
| JAMES W. CARELL, ROBERT VINING, | ) | Judge Thomas A. Wiseman, Jr. |
| DIVERSIFIED HEALTH MANAGEMENT, INC. | ) | |
| (also known as CAREALL MANAGEMENT, LLC), | ) | |
| THE JAMES W. CARELL FAMILY TRUST, | ) | |
| CAREALL, INC., VIP HOME NURSING AND | ) | |
| REHABILITATION SERVICES, LLC (also known | ) | |
| as VIP HOME NURSING AND REHABILITATION | ) | |
| SERVICES, INC.), PROFESSIONAL HOME | ) | |
| HEALTH CARE, LLC (also known as | ) | |
| PROFESSIONAL HOME HEALTH CARE, INC.), | ) | |
| and UNIVERSITY HOME HEALTH, LLC (also | ) | |
| known as UNIVERSITY HOME HEALTH, INC.), | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

In its Amended Complaint in this action (Doc. No. 48), plaintiff United States of America (the

"Government") asserts various violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733,

against three of the eight defendants, as well as a right to recover damages under common-law theories

of unjust enrichment and payment by mistake of fact against all of the defendants. (Am. Compl., Doc. No.

48, Counts I–IV.) Now before the Court are five separate Motions to Dismiss filed respectively by

defendants Robert Vining (Doc. No. 67); VIP Home Nursing and Rehabilitation Services, LLC,

Professional Home Health Care, LLC and University Home Health, LLC (Doc. No. 70); James W. Carell

and CareAll, Inc. (Doc. No. 74); CareAll Management, LLC f/k/a Diversified Health Management, Inc.

("Diversified") (incorrectly named in the Complaint as "Diversified Health Management, Inc. (also known

as CareAll Management, LLC)") (Doc. No. 76); and the James W. Carell Family Trust (Doc. No. 78).

All of the defendants assert that the claims brought by the Government are barred by the

applicable statutes of limitation. In addition, defendant James W. Carell Family Trust also argues that the

claims against it are subject to dismissal on the grounds that (1) the Trust cannot be held liable as the

owner of a corporate defendant alleged to have violated the FCA and the common law; and (2) the

Amended Complaint does not assert facts that provide a legitimate basis for holding the Trust liable, on an alter ego theory, for an individual defendant's alleged violations of the FCA and the common law.

For the reasons set forth herein, the Court finds that the facts pleaded in the Amended Complaint with respect to the FCA claims, asserted only against defendants Carell, Diversified and the Trust, are sufficient to establish that the claims are not barred by the statute of limitations set forth in 31 U.S.C. § 3731. The motions to dismiss those claims will therefore be denied.

The Court will defer ruling on the motions to dismiss the common-law claims and will grant the Government permission to file a Second Amended Complaint alleging facts sufficient to establish the date upon which those claims accrued for purposes of computing the limitations period set forth in 28 U.S.C. § 2415.

Finally, the Trust's motion to dismiss the claims against it for failure to state a claim based on an alter ego theory of recovery will likewise be denied.

## I.      STANDARD OF REVIEW

In order to survive a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1927, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Allegations that raise the "sheer possibility that a defendant acted unlawfully" are insufficient. *Id.* A complaint must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Id.* A complaint that "offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555).

Generally speaking, a 12(b)(6) motion to dismiss is not an appropriate vehicle for raising an affirmative defense, such as the statute of limitations, because plaintiffs are not required to "anticipate and attempt to plead around all potential defenses. Complaints need not contain any information about defenses and may not be dismissed for that omission." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980); other citations omitted). The Sixth Circuit has recognized, however, that a plaintiff may incur an "obligation to plead facts in avoidance of the statute of limitations defense" when it is otherwise " 'apparent from the face of the complaint that

the time limit for bringing the claim[s] has passed.' " *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 518 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). In such a case, a motion to dismiss may appropriately be grounded upon a plaintiff's failure to plead tolling or other facts showing the claims are not barred by the statute of limitation.

## II.    PROCEDURAL BACKGROUND AND FACTUAL ALLEGATIONS

Medicare, the common name for the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act ("Act"), 42 U.S.C. §§ 1385 *et seq.*, is a federally funded health insurance program administered by the United States through the Department of Health and Human Services ("HHS"). Palmetto Government Benefits Administrators, LLC ("Palmetto") was, at all times relevant to this action, the "regional home health intermediary" or fiscal intermediary that administered Medicare's home health and hospice benefits in Tennessee.

Defendant James Carell, a resident of Nashville, Tennessee was President of Diversified and CareAll, Inc. and operated these companies at all times relevant to the Government's claims. He was the full owner or part owner of Diversified until July 2000. Diversified is a Tennessee corporation with its principal place of business in Tennessee.

Defendant James W. Carell Family Trust (the "Trust") was a part or full owner of Diversified at all relevant times. Defendant Carell is the sole settler of the Trust, which was formed solely for the benefit of Carell's children and their issue. On July 1, 1999, Carell transferred eighty percent of his stock in Diversified to the Trust. On July 1, 2000, he transferred his remaining twenty-percent interest in Diversified to the Trust. The Government asserts that Carell did not receive any consideration from the Trust in exchange for his transfer of Diversified's stock to the Trust and, therefore, that the transfer was not an "arms-length" transaction. The Government further asserts that the Trust did not maintain an arms-length relationship between itself and other related entities, including the other defendants in this suit. In addition, following the transfer of Diversified's stock from Carell to the Trust, Diversified continued to have substantially identical management, attorneys, business, purpose, operation, equipment, customers and supervision as before. Carell continued to work for Diversified and ran the company following its transfer to the Trust. On the basis of these alleged facts, the Government asserts that the Trust constitutes an alter ego of Carell and that failure to consider it as such would promote injustice.

Defendant Robert Vining, a Missouri resident, was President of defendants VIP Home Nursing and Rehabilitation Services, LLC ("VIP"), Professional Home Health Care, LLC ("Professional") and University Home Health, LLC ("University") (collectively, the "Home Health Agencies") at all relevant times. He owned the three Home Health Agencies until December 2002. The three Home Health Agencies are all Tennessee companies with their principal place of business in Tennessee, and were managed at all relevant times by Diversified.

Defendant CareAll has owned the three Home Health Agencies since December 2002. Carell is the sole owner of all stock in CareAll as well as its President. Since Carell's acquisition of the Home Health Agencies from Vining, the Agencies have continued to have substantially identical management, business, purpose, operation, equipment, customers, supervision and *de facto* ownership. The Government maintains that, even prior to the express acquisition by CareAll of the Home Health Agencies in 2002, CareAll and Carell were the *de facto* owners of the Agencies.

Each year, home health agencies like the three Home Health Agency defendants here are required to submit annual cost reports to the Medicare program's intermediaries, in this case Palmetto, in order to obtain reimbursement from the Medicare program. The Government maintains in its Amended Complaint that Carell, Vining, and the Trust caused VIP, Professional and University to submit fraudulent cost reports to Medicare seeking full reimbursement for Diversified's management services for the years 1999, 2000 and 2001. Specifically, the cost reports that are the subject of the Government's claims were submitted to Palmetto by VIP on November 29, 1999, November 27, 2000 and July 31 2002; by Professional on October 28, 1999, October 31, 2000 and August 1, 2000; and by University on May 26, 2000 and June 14, 2000.

The Government maintains that the Home Health Agencies concealed the related-party relationship between each of them and Diversified, when Medicare rules required such disclosure, and when the existence of such relationship entitled them to seek reimbursement for Diversified's management services on an "at cost" basis only. The Government asserts that the defendants' actions resulted in overpayment by Medicare in the approximate amount of $6.3 million. In addition to recuperation of that amount, the Government asserts that it is entitled to a civil penalty in the range of $5500 to $11,000 for each violation, plus treble damages under the FCA.

Defendants point out that the Government, acting through Palmetto, had the right to audit the cost reports. (Am. Compl. ¶ 18.) The Government adds, however, that this right includes the right to make retroactive adjustments to home health agency cost reports previously submitted by a provider if any overpayments have been made. (*Id.* (citing 42 C.F.R. § 413.64).) At various times relevant to this action, Palmetto actually audited the Home Health Agencies cost reports. As early as 1995, a Palmetto audit supervisor informed Diversified that it would treat the management fees and interest expenses charged by Diversified to the Home Health Agencies as related-party costs. (Am. Compl. ¶ 45.) In 1999, Palmetto again informed the Home Health Agencies' representatives that Diversified and the Agencies constituted related parties. (*Id.* ¶ 46.) Carell and Diversified ignored these "warnings" and apparently continued to cause the three Home Health Agencies to submit cost reports to Medicare that concealed the related party issue and did not list the management fees on an "at cost" basis as required by Medicare rules.

Through September 30, 2000, Medicare reimbursed home health agencies for all allowable costs of direct patient care of Medicare beneficiaries and for reasonable administrative expenses associated with such care, including the cost of home health aides. Beginning October 1, 2000, Medicare amended the rules providing for cost reimbursement for home health agencies. Under the new Medicare rules, Medicare no longer paid for all past costs incurred, but instead introduced the Prospective Payment System ("PPS"). Under this new system, it was no longer advantageous for home health agencies to bill Medicare for the services provided by management companies. On December 6, 2002, approximately two years after the PPS period began, Vining sold the three Home Health Agencies to CareAll for $500,000. In addition, Carell agreed to pay Vining $100,000 as a consultant for ten years. The Government maintains that this sale price was well below the Agencies' fair market value at the time. The Government also alleges that this sale only served to make official Carell's *de facto* ownership and control of these Agencies, which he had maintained since Vining first purportedly purchased them. (Am. Compl. ¶¶ 47–48.)

This case was first referred to an official with the Criminal Division of the United States Attorney's Office on August 22, 2005. (Am. Compl. ¶ 5.) The Government contends that "officials of the United States charged with responsibility to act under the circumstances—namely, the appropriate official of the Civil Division of the Department of Justice—did not know about, and should not reasonably have known

about, facts material to this right of action" until that date. After that date, defendants Carell, Diversified and the Trust entered into three separate tolling agreements with the Government that tolled the statute of limitations for causes of action under the False Claims Act and the common law from October 30, 2006 through May 1, 2007; from February 6, 2009 through April 20, 2009; and from April 20, 2009 through May 18, 2009.

The Government filed its complaint in this action on May 18, 2009. In response to an initial round of motions to dismiss filed by each of the defendants, all premised upon their assertion that the Government's claims were barred by the applicable statutes of limitations, the Government filed its Amended Complaint (Doc. No. 48) on July 30, 2009, adding additional supporting facts pertaining to the statutes of limitations and the alter ego relationship between James W. Carell and the Trust. As a matter of law, for purposes of the statute of limitations analysis, the Amended Complaint relates back to the date of the original complaint. Fed. R. Civ. P. 15(c)(1)(B). The defendants have now, of course, refiled their motions to dismiss, this time directed toward the allegations in the Amended Complaint.

## III. ANALYSIS AND DISCUSSION

Defendants all assert that the claims against them are barred by the applicable statutes of limitation. Because different analyses apply to the claims brought under the FCA and those brought under the common law, the Court will consider the two sets of claims separately. In addition, the Court must also consider the additional defenses raised by the Trust.

### A. The FCA Claims

The FCA contains its own statute of limitations, which provides alternatively that a suit may not be brought more than six years after the date on which the FCA violation is committed, 31 U.S.C. § 3731(b)(1), nor more than three years "after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with the responsibility to act in the circumstances." 31 U.S.C. § 3731(b)(2).[1]

In the present case, it is apparently undisputed that the Government's claims fall outside the six-year limitations period set forth in § 3731(b)(1), even taking into consideration the various tolling

---

[1] The same provision also constitutes a statute of repose insofar as it states that a cause of action under the FCA shall "in no event" be brought "more than 10 years after the date on which the violation is committed." 31 U.S.C. § 3731(b)(2). The repose provision is not relevant here.

agreements executed by the relevant parties. In addition, defendants Carell, Diversified and the Trust—the only defendants against whom the FCA claims are asserted (the "FCA defendants")—argue that the FCA claims are barred under § 3731(b)(2) because, although suit was brought within three years of the date on which the matter was referred to the criminal and civil divisions of the United States Attorney's Office (taking into consideration the tolling agreements), it was not brought within three years of when "the official of the United States charged with the responsibility to act in the circumstances," 31 U.S.C. § 3731(b)(2), *should* have learned of the facts material to the Government's right of action. The FCA defendants point out that the law is unclear as to who exactly qualifies under the statute as an "official of the United States charged with the responsibility to act," and assert that "the better interpretation of the responsible official language is that it refers to the client agencies that refer cases to the Justice Department. (Doc. No. 75, at 9 n.3.) In addition, however, the FCA defendants argue that, even assuming that the United States Attorneys' office is the official charged with the responsibility to act referenced in the statute, the pleadings in the Amended Complaint do not plausibly aver that the U.S. Attorneys' office should *not* reasonably have known about the material facts at issue here prior to expiration of the three-year limitations period. The Government, of course, argues that the designated official must be an official within the Civil Division of the Justice Department, and that the Amended Complaint adequately pleads facts establishing that the requisite official did not know, and should not reasonably have known the material facts giving rise to the instant claims until August 22, 2005 at the earliest—the date on which the claims were first referred to an official within the Criminal Division of the Justice Department.

### (1)     *The United States Official Charged with Responsibility to Act*

As an initial matter, the Court agrees with the Government that the official charged with responsibility to act under the limitations period established by § 3731(b)(2) is an official within the Justice Department.

The only reported case of which this Court is aware that has seriously considered the interpretation of the "official charged with responsibility" language in the statute is *United States v. Village of Island Park*, 791 F. Supp. 354 (E.D. N.Y. 1992). There, the court first noted that the fact that the Attorney General is given the responsibility, under the FCA, for bringing a civil action for violations of the

FCA (a factor upon which the Government relies here) is somewhat equivocal in light of the fact that FCA actions have also been brought routinely by government corporations in their own names. *Id.* at 362 ("The government proposes no satisfactory explanation for the apparent conflict between those authorities that hold that only the Attorney General . . . may bring suit under the False Claims Act and those authorities in which this 'rule' clearly does not bar suit by a federal corporation that proceeds in its own name. But to the extent that federal corporations or federal agencies may in fact sue to enforce the False Claims Act, the argument that "the official . . . charged with responsibility to act" designates only officials within the DOJ is correspondingly less persuasive.").

The *Island Park* court also acknowledged the government's argument in the case before it, raised by the Government in the present case as well, that the legislative history of the False Claims Amendments Act, which added § 3731(b)(2) to the FCA, explicitly presumes that the phrase "the official of the United States charged with responsibility to act in the circumstances" refers to an official within the Department of Justice:

> Subsection (b) of section 3731 of title 31 . . . would include an explicit tolling provision on the statute of limitations under the False Claims Act. The statute of limitations does not begin to run until the material facts are known *by an official within the Department of Justice* with the authority to act in the circumstances.

*Id.* (quoting S. Rep. No. 345, 99th Cong., 2d Sess. 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5295 (emphasis added)). However, the court also noted inconsistency within the legislative history pertaining to the relevant phrase, including the fact that "the same Senate Report elsewhere reformulates the changes proposed by Section 3731(b)(2)" as providing a three-year limitations period running from when "the Government" learns of a violation. *Id.* at 362–63 (quoting S. Rep. No. 345, at 15, 1986 U.S.C.C.A.N. at 5280). Finally, the court observed that it was unclear why Congress chose to use such a broadly—and vaguely—worded phrase as "the official . . . charged with the responsibility to act" in the context of the statute of limitations to refer only to an official within the Justice Department, when it specified elsewhere that the "Attorney General" was the official with the sole power to perform certain functions under the FCA. *Id.* at 363.

Finally, the court noted that "[t]he case law since the False Claims Amendments Act has not made this difficulty any easier to explain." *Id.* (citing *United States v. Macomb Contracting Corp.*, 763 F. Supp. 272, 274 (M.D. Tenn. 1990) ("The 'official of the United States charged with responsibility' *could*

*only have been* the appropriate official of the Civil Division of the Department of Justice, which alone has

the authority to initiate litigation under the Act."), and *United States ex rel. Kreindler & Kreindler v. United*

*Techs. Corp.*, 777 F. Supp. 195 (N.D.N.Y. 1991) ("[T]he facts material to relator's cause of action were

known, in 1979 by the senior [Army] officials in charge of the Black Hawk project.  Thus, those facts were

known, or reasonably should have been known, by officials with the responsibility to act.").

Confronted with such "patently inconsistent authority," the court nonetheless ultimately chose to

construe the tolling provision of § 3731(b)(2) "with reference to the legislative history" and therefore held

that the "official . . . charged with responsibility to act" must be "an official within the Department of Justice

with the authority to act in the circumstances."  *Id.*  In light of *United States v. Macomb Contracting Corp.*,

763 F. Supp. 272, 274 (M.D. Tenn. 1990), the only other reported case within the Sixth Circuit to consider

the question, as well as long-standing Supreme Court precedent establishing that "statutes of limitations

are construed narrowly against the government" such that "the sovereign is given the benefit of the doubt

if the scope of statute [of limitations] is ambiguous," *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95 (2006),

this Court likewise concludes that the "official" referenced in the statute must be a Justice Department

official.  Because the question of whether that official must actually be within the Civil Division of the

Justice Department is not material to the resolution of the present motions, the Court does not reach the

Government's contention in that regard.

### (2)     Allegations Relating to When the Justice Department Reasonably Should Have Known the Material Facts Giving Rise to Its Claims

In its Amended Complaint, the Government asserts that "the appropriate official of the Civil

Division of the Department of Justice—did not know about, and should not reasonably have known about,

facts material to this right of action until August 22, 2005, when this case was first referred to an official

with the Criminal Division of the United States Attorney's Office."  (Am. Compl. ¶ 5.)  In their motion, the

FCA defendants raise two arguments in support of their claim that the "should have known" language in

the statute of limitations bars the Government's claims here.   First, the FCA defendants argue the

Government's pleading does not contain sufficient factual allegations relevant to its contention that the

Government could not reasonably have known of the relevant facts prior to August 22, 2005.  Second, the

FCA defendants argue that the "existence of the related party relationship" was known to the

Government's contractor, Palmetto, "as early as 1995" and that Palmetto "reiterated" its accusation in

1999.  Thus, the FCA defendants assert, "[i]n the face of its own allegations that its contractor charged with responsibility for running Medicare's home health program in Tennessee was aware of the related party issue some fourteen years before it filed this Complaint, the United States cannot credibly argue that it brought this action within 3 years of when it should reasonably have learned of the alleged related party relationship."  (Doc. No. 75, at 7.)

The FCA defendants' arguments are unavailing.  First, with respect to Palmetto's knowledge of the related-party relationship, it is clear that the material fact of which the Government needed to be aware prior to taking any action was not simply the related-party relationship but the filing of fraudulent or falsified cost reports that failed to disclose the related-party relationships.  The reports upon which the Government's claims are premised were filed on October 28, 1999, November 29, 1999, May 26, 2000, October 31, 2000, November 27, 2000,June 14, 2002, July 31, 2002, and August 1, 2002.  Palmetto's knowledge of the related-party problem as it related to other cost reports for other years that predated the filing of the contested cost reports, is therefore beside the point, at least for pleading purposes.

With respect to the sufficiency of the pleading, defendants seem to have overlooked the long-established principle that a plaintiff has no obligation to plead that his claim is *not* barred by the statute of limitations unless "it is apparent from the face of the complaint that the time limit for bringing the claim[s] has passed."  *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)).  Further, a motion to dismiss based on the statute of limitations should be denied if any issues of fact are involved.  *Stiles v. Porter Paint Co.*, 75 F.R.D. 617 (E.D. Tenn. 1976).  In this case, the Government has alleged that it neither knew nor had reason to know the facts giving rise to its claims prior to August 22, 2005, the date on which the case was first referred to an official within the Criminal Division of the U.S. Attorney's Office.  That allegation, standing alone, is sufficiently concrete to satisfy the Government's pleading obligation under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), even assuming under *Bishop* that the Government had an obligation to plead facts showing the statute of limitations does not bar its claims.  The Government has alleged a particular date upon which the appropriate Government official received specific knowledge of the facts underlying the claims against the FCA defendants.  That allegation gives rise to a reasonable inference that there was no reason the Government should have known about those facts prior to the

date upon which it obtained actual notice or knowledge of those facts, and no further specificity was required to support the allegation that the Government should not reasonably have known about the material facts prior to that date.

Moreover, the FCA defendants bear the burden of establishing that the Government's claims are barred by the statute of limitations. *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). The only "evidence" in the complaint to which the defendants point in support of that burden is Palmetto's knowledge, before the Government's claims accrued, of the alleged related-party relationship. As previously indicated, there is no suggestion in the record that Palmetto's warnings concerned the cost reports that are at issue in this lawsuit. As the Government further points out, there is no indication that Palmetto's findings were final or were ever communicated to anyone outside Palmetto other than the defendants. More to the point, Palmetto's knowledge would not "prove" the Government should have known sooner about the fraudulent cost reports for the years at issue—at best Palmetto's knowledge creates a factual issue as to when the Government should have learned the material facts giving rise to its claims.

In fact, the courts have repeatedly recognized that the question of when the responsible government official "should have known" facts material to the FCA or equity claims is generally "a complex factual determination." *United States ex rel. Wyke v. Am. Int'l, Inc.*, No. 01-60109, 2005 WL 1529669, at *3 (E.D. Mich. June 20, 2005) (quoting *United States ex rel. Purcell*, 254 F. Supp. 2d 69, 78 (D.D.C. 2003) (quoting *United States v. Hess*, 194 F.3d 1164, 1175 (10th Cir. 1999))). In this case as well, the question of when the Government should have known about the violations giving rise to its claims in this suit is a material factual issue, not one that is subject to resolution in a motion to dismiss.

Because the Government has successfully pleaded facts that, if proved, would establish that its cause of action accrued within the statute of limitations set forth in 31 U.S.C. § 3731(b)(2), taking into account the written tolling agreements, the FCA defendants' motion to dismiss the FCA claims against them must be denied.

**B.      The Common-Law Claims**

With respect to the common-law causes of action brought against all the defendants, a different statute of limitations period and tolling provision apply. The defendants assert that the claims are

completely barred by the statute of limitations. The Government contends that the tolling provision renders the claims timely, regardless of the date on which the claims otherwise began to accrue. Alternatively, the Government contends that it should be granted leave to plead facts establishing that the claims did not accrue until well within the limitations period.

### *(1)    The Applicable Limitations Period*

The common-law claims are subject to the statute of limitations for actions brought by the United States set forth in 28 U.S.C. § 2415. The statute prescribes a six-year limitations period for claims related to express or implied contracts, § 2415(a), and a three-year limitations period for tort actions for money damages, § 2415(b). Defendant Vining, argues, with some basis in reason but not in precedent, that the three-year period applies since the Government's claims sound in fraud, a tort. The other defendants essentially concede that the law is fairly well established that claims for unjust enrichment and payment by mistake, both quasi-contractual claims, require application of § 2415(a), essentially as a result of the long-standing "historical accident" that placed unjust enrichment claims in the category of contract or quasi-contract rather than under the "tort" heading.

The Court agrees that the six-year limitations period applies. The Seventh Circuit is apparently the only court to have considered this issue in some depth. In *FDIC v. Bank One*, 881 F.2d 390, 392 (7th Cir. 1989), and later in *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362 (7th Cir. 1992), the court observed that, while it would be logical to consider quasi-contractual claims as related to tort claims, history and precedent mandate otherwise:

> In [*FDIC v. Bank One*], we considered the statute of limitations applicable to quasi-contract claims brought on behalf of federal governmental agencies. We noted that there was a great deal of logical support for the position that a "quasi-contract" or "unjust enrichment" recovery should be governed by the three year statute of limitations applicable to the tort of fraud:

> 'Quasi-contract' allows the victim to follow the proceeds of the fraud, collecting them from the pocket in which they land, but does not change the gravamen of the wrong-here, fraud. No tort, no unjust enrichment. Because . . . recovering 'unjust enrichment' is simply a way to recoup the losses caused by the tort, it seems strange to think that a different caption on the pleadings, a demand against a person farther removed from the wrong, means a longer period of limitations. Unjust enrichment is a remedy in search of a wrong; as a remedy its period of limitations might logically be assimilated to that for the wrong.

> *Bank One*, 881 F.2d at 392. Nonetheless, we concluded that it was necessary to apply the contract statute of limitations found in 28 U.S.C. § 2415(a) to a "quasi-contract" cause of action:

On first principles, then, the period of limitations for unjust enrichment actions should track that of the wrong. . . . Unfortunately, however, first principles are the only support for this conclusion. For hundreds of years, courts in England and the United States have been doing things otherwise, and this conclusion is too well established to be overthrown. . . .

. . . [W]hen Congress enacted § 2415 in 1966, providing that suits 'founded upon any contract express or implied in law or fact' could be brought within six years, such a provision had a definite meaning in common law jurisdictions. The statute was designed to put the United States as plaintiff on the same footing as private litigants. . . . Because private litigants have been able to use the period of limitations for contracts ever since 'unjust enrichment' landed in the 'contract' cubbyhole in the seventeenth century, our contrary assessment does not justify a different result. . . .

*Bank One*, 881 F.2d at 382–93.

*First Nat'l Bank of Cicero*, 957 F.2d at 1371 (quoting *Bank One*, 881 F.2d at382–93; some ellipses in original; other internal citations omitted). Other circuit courts that have considered the issue have reached the same conclusion. *See, e.g.*, *United States v. Dae Rim Fishery Co.*, 794 F.2d 1392 (9th Cir. 1986) (holding that quasi-contractual claims for unjust enrichment brought by the United States under the Federal Water Pollution Control Act are governed by the six-year limitations period established in 28 U.S.C. § 2415(a)); *United States v. P/B STCO 213*, 756 F.2d 364, 374–76 (5th Cir. 1985) (same). Based on this precedent, district courts confronted with the question have mostly presumed without analysis that the six-year limitations period applies to claims for unjust enrichment and payment by mistake brought in the context of FCA claims for Medicare fraud or overpayment. *See, e.g.*, *United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, Nos. 02-5702, 08-1265 2009 WL 1288962, at *11 (D.N.J. May 7, 2009) (where the government asserted claims for unjust enrichment and payment by mistake alongside its claims under the FCA to recover fraudulently obtained Medicare reimbursement payments, holding without discussion that § 2415(a) governed the common-law claims); *United States v. Clawson Med. Rehab. & Pain Care Ctr., P.C.*, 722 F. Supp. 1468, 1470 (E.D. Mich. 1989) (likewise assuming without discussion that the federal six-year statute of limitations applies to actions to recover Medicare overpayments). *Accord United States v. Macomb Contracting Corp.*, No. 3-84-1095, 1988 U.S. Dist. LEXIS 17608, at *117 (M.D. Tenn. Oct. 14, 1988) (presuming without discussion that § 2415(a) applied to the Government's claims for unjust enrichment and payment by mistake, though dismissing those claims on other grounds). The Sixth Circuit has not ruled on this issue, but this Court will follow the Seventh Circuit's well reasoned analysis in *Bank One*, 881 F.2d at 392, reiterated in *First Nat'l Bank of Cicero*, 957

F.2d at 1372, to conclude that the six-year limitations period applies to the Government's state-law claims.

### (2) When Did the Government's Overpayment Claims Accrue?

The limitations period having been established, the next logical question is when does that period begin to run; that is: When does a cause of action for overpayment actually accrue? The parties raise several discrete arguments in that regard. The defendants claim, alternatively, that the statute begins to run either when payment is made to a provider by the government (*see* Doc. No. 71, at 9 (citing *United States v. Kass*, 740 F.2d 1493, 1497 (11th Cir. 1984), and *Macomb*, 1988 U.S. Dist. LEXIS 17608, at *122)), or when a provider submits a final cost report (claim) (*see* Doc. No. 68, at 3–4). The Government contends, to the contrary, that a cause of action for Medicare overpayment does not accrue until the Government's fiscal intermediary receives the cost report, analyzes it and conducts an audit if necessary, and then at the completion of the audit "furnish[es] the provider with written notice of program reimbursement (NPR) setting forth the total amount of reimbursement due under the program." (Doc. No. 82, at 25–26 (quoting *Alacare Home Health Servs., Inc. v. Sullivan*, 891 F.2d 850, 852 (11th Cir. 1990)).)

Administered by the Secretary of Health and Human Services ("the Secretary"), Part A of the Medicare program provides payment for hospital, related post-hospital, home health, and hospice care services furnished to eligible individuals. 42 U.S.C. §1395c. With certain exceptions, providers of home health care services under Part A of the program receive compensation based upon the lesser of the customary charge or the reasonable cost of such services. *See* 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 413.1(b). To ensure the providers a steady flow of income sufficient to allow them to provide services, Medicare provides for interim payments to the providers, which are later subject to a year-end accounting to adjust for underpayments or overpayments. *See* 42 C.F.R. § 413.64(b).

The interim payments are made to providers by a fiscal intermediary no less often than monthly. 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(b). Fiscal intermediaries are private organizations that contract with the Secretary to furnish administrative services for Part A of the Medicare program. *See* 42 U.S.C. 1395h. Palmetto was the fiscal intermediary that operated in this case between the home health defendants and Medicare.

The monthly interim payments, it is important to note, are based upon *estimates* of the provider's

costs. These payments are made *before* the provider submits detailed claims, or cost reports, documenting its actual costs. However, pursuant to statute, the implementing regulations must "provide for the making of suitable retroactive adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." 42 U.S.C. § 1395x(v)(1)(A)(ii) (2000). Thus, the regulations specify that at the close of each fiscal year, the provider must give the fiscal intermediary a statement of its actual costs along with supporting documentation. 42 C.F.R. § 413.24(a). To ensure the timely reimbursement of providers who may have been underpaid, the fiscal intermediary, upon receipt of the cost report, conducts a desk audit and issues a tentative final settlement or "initial retroactive adjustment," purely for the purpose of bringing the money that the provider actually received in line with the costs set forth in the provider's cost report. 42 C.F.R. § 413.64(f)(2) ("For this purpose, the costs will be accepted as reported, unless there are obvious errors or inconsistencies . . . ."). Thereafter, the fiscal intermediary conducts a comprehensive final audit of the cost report and issues a written Notice of Program Reimbursement ("NPR"). *See* 42 C.F.R. §§ 405.1803(a). The NPR constitutes the intermediary's final determination of the total amount of reimbursement due under the program, *id.*, and it may differ substantially from the initial adjustment made upon the provider's submission of its cost report. The NPR must explain how the intermediary reached its conclusions and detail any reasons why the program reimbursement differs from the provider's claim.

Largely because the intermediary is required to submit payments to providers *before* providers submit cost reports, and in light of the role of the NPR in Medicare cost report cases, "the prevailing view" among courts that have seriously considered the issue is that the statute of limitations in § 2415 for Medicare overpayment claims begins to run as of "the date of the Intermediary's final determination and issuance of the NPR," *United States v. Home Health Agency, Inc.*, 862 F. Supp. 129, 135 (N.D. Tex. 1994), because it is only at that point that the Government can legally require a provider to repay an overpayment. *United States v. Hughes House Nursing Home, Inc.*, 710 F.2d 891, 893–95 (1st Cir. 1983). *Accord United States v. Gravette Manor Homes, Inc.*, 642 F.2d 231, 234 (8th Cir. 1981) (holding that the government's cause of action to recover Medicare overpayment "accrues with the making of the final retroactive adjustment . . . which sets the exact amount of overpayment or underpayment due from or to a

provider"); *United States v. Gareda Diversified Business Servs., Inc.*, No. 94 C 5849, 1995 WL 263492, at *5 (N.D. Ill. April 27, 1995) (citing *Gravette*, among others, to hold that "the final determination of liability [is] critical to the determination of when a cause of action accrues" for reimbursement of Medicare overpayment); *United States v. Glass Nursing & Convalescent Homes, Inc.*, 550 F. Supp. 1149, 1152 (S.D. Ohio 1982) (noting that the Government's cause of action accrues upon the making of the final retroactive adjustment, as that is the date when liability is finally determined (citing *Gravette*, 642 F.2d at 234)). *See also United States v. Withrow*, 593 F.2d 802, 805 (7th Cir. 1979) (reversing summary judgment for the defendant based on statute of limitations grounds and holding, without reference to the NPR, that a cause of action for overpayment under Medicare Part A does not accrue for purposes of § 2415(a) until the intermediary's final audit is completed, because prior to that time, neither party could be liable to the other for additional payment or reimbursement); *United States v. Pisani*, 646 F.2d 83, 89 (3d Cir. 1981) (same). *Accord United States v. Robert's Nursing Home*, 710 F.2d 1275 (7th Cir. 1983) (holding under the particular facts of that case that the statute began to run when the fiscal intermediary made an initial demand for payment from the provider and not when the final accounting and NPR were issued some fourteen months later, but also finding that the holding did not conflict with *Gravette* because, in that case, no demand for payment or notice of overpayment was sent to the provider prior to the final adjustment).

### (3)    The Government's Pleading Obligation

In the present case, the Amended Complaint does not indicate when the final audits were conducted and the NPRs issued for the cost reports that are the subject of the Government's claims (or whether Palmetto, the fiscal intermediary, made a demand for repayment at any time prior to issuance of the NPR). Instead, it simply indicates the date on which the cost reports themselves were submitted. With regard to that omission, the Government contends, first, that regardless of the actual accrual date, the running of the limitations periods was tolled until August 22, 2005, the date the case was first referred to an official with the Criminal Division of the United States Attorney's Office. In support of that argument, the Government references the tolling provision that pertains to § 2415, which states in pertinent part: "For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which . . . facts material to the right of action are not known and reasonably could not

be known by an official of the United States charged with the responsibility to act in the circumstances." 28 U.S.C. § 2416(c). The Government then goes on to argue at great length that the "responsible official" referenced in the statute must be an official within the Justice Department, because (1) the tolling provision should be read consistently with the identically worded statute of limitations pertaining to FCA claims, § 3731(b)(2); and (2) the United States Attorney General has exclusive authority to prosecute fraud. Alternatively, the Government requests, in the event the Court determines that the statute of limitations for the state-law claims was not tolled, that it be granted leave to amend its complaint (again) to allege facts showing the final audits and NPRs were not issued until September 24, 2004 and thereafter (if at all)—all dates well within the six-year statute of limitations.

The Court finds this case to be in an unusual procedural posture. As discussed above in connection with the FCA claims, a plaintiff is ordinarily not required to plead that his claim is *not* barred by the statute of limitations, because the statute of limitations is an affirmative defense for which the defendant bears the burden of proof. *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). Consequently, the statute of limitations issue in most cases cannot be decided on a motion to dismiss or from the face of a plaintiff's complaint. *See Stiles v. Porter Paint Co.*, 75 F.R.D. 617 (E.D. Tenn. 1976) (noting that, in order to dismiss for failure to comply with statute of limitations, the statutory bar must be clearly apparent from face of complaint, and that a motion to dismiss based upon statute of limitations should be denied if any issues of fact are involved). The Sixth Circuit has held, however, that a plaintiff may have an obligation to plead facts in avoidance of the statute of limitations defense if "it is apparent from the face of the complaint that the time limit for bringing the claim[s] has passed." *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)).

With respect to whether the Government had such an obligation in this case, the Government has pleaded claims based on cost reports prepared by the defendants for fiscal years 1999, 2000 and 2001, which were submitted in 1999, 2000 and 2002. Suit was not filed until May 15, 2009. In light of length of time between these dates, it is at least arguable that the Government had an obligation to plead facts showing that its claims were not barred by the statute of limitations, including such facts as would indicate when its claims actually accrued. *Cf. Bishop*, 958 F.2d at 744. The Government did this with respect to

the FCA claims when it alleged in its Amended Complaint that the government official identified in the actual statute of limitations did not learn and should not have learned of the material facts giving rise to the FCA claims until August 22, 2005, and that certain tolling periods applied to extend the three-year statute of limitations beyond the date on which the original complaint was filed.

The same is not true for the state-law claims. The statute of limitations pertaining to the Government's state-law cause of action and the tolling provision related to that statute are structurally quite different from the statute of limitations and tolling that apply to the FCA claim. The statute creating the limitations period for FCA actions essentially includes a tolling provision as part of the actual statute of limitations: "A civil action under section 3730 may not be brought . . . more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." 71 U.S.C. § 3731(b)(2). Conversely, section 2415(a) creates a six-year limitations period that begins to run, as discussed above, at the time the fiscal intermediary completes the final audit and issues the NPR. The dates when those events occurred with respect to the cost reports at issue are not identified in the original or amended complaint.

Rather than alleging facts pertaining to accrual, the Government has alleged facts potentially pertaining to the tolling of its common-law claims. A plaintiff's burden to establish the *tolling* of a statute of limitations does not arise, however, until a defendant succeeds in establishing both that (1) there is no genuine issue of material fact as to when the plaintiff's cause of action accrued and (2) the statute of limitations has run. *Campbell*, 238 F.3d at 775. *See also Fonseca v. CONRAIL*, 246 F.3d 585, 590–91 (6th Cir. 2001) (if defendants fail to meet their burden of proof, plaintiff has no obligation to proffer any additional evidence to rebut the statute of limitations defense). In other words, the question of tolling normally only becomes relevant once a defendant has shown that a limitations period has otherwise expired. Here, the Government seeks to show that it has adequately pleaded tolling without first having made any showing as to when its claims accrued in the first place or, consequently, whether tolling would be necessary in order to preserve the claims.

In light of the complexity of the legal issues raised by the Government's tolling argument with

respect to the common-law claims,[2] the Court declines the invitation to enter the house through the back door—that is, to consider whether the claims were tolled before deciding when the claims actually accrued (which might obviate any need to consider the tolling question). Instead, the Court will defer ruling on the tolling question and on the issue of whether the statute of limitations has run as to the Government's state law claims, and will grant the Government's request to amend its complaint a second time in order to allege facts that establish the timeliness of its claims based on the dates that Palmetto conducted the final audit and issued the NPRs, or, as the case may be, why NPRs were never issued for the contested cost reports. The Government will have two weeks from the date of entry of this Order to file its Second Amended Complaint, after which the Court will reconsider the Defendants' motion to dismiss those claims based on statute of limitations grounds.

      **C.    Whether the Amended Complaint States a Claim against the Trust**

      The James W. Carell Family Trust has filed its own motion to dismiss (Doc. No. 78) and supporting memorandum of law (Doc. No. 79) in which it raises, beside the statutes-of-limitation defense addressed by the other defendants, the following arguments: (1) that the Trust cannot be held liable merely on the basis that it is the owner of a corporate defendant alleged to have committed FCA and common-law violations; and (2) that, based upon the bare allegations in the Amended Complaint, the Trust cannot be held liable as the alter ego of an individual defendant alleged to have committed those offenses.

      As an initial matter, the Court observes the Government has asserted both FCA and state common-law claims against the Trust, but neither party has addressed the question of whether state or federal common law governs consideration of the Government's alter ego theory of liability against the Trust. In that regard, it appears that federal common law determines the parameters of the alter ego doctrine where the underlying cause of action is based on a federal question. *See N.L.R.B. v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 335 (6th Cir. 1990) (noting that the question of "[w]hether a company or individual is responsible for the financial obligations of another company or individual is a question of federal law when it arises in the context of a federal labor dispute"); *accord United*

---

     [2] Contrary to the Government's assertions, it is not necessarily clear that the "official of the United States" is the same person for purposes of both statutes despite the identical language used in the statutes.

*Steelworkers of Am. v. Connors Steel Co.*, 855 F.2d 1499, 1506 (11th Cir. 1988), *cert. denied*, 489 U.S. 1096 (1989); *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 690 n.6 (5th Cir. 1985), c*ert. denied*, 475 U.S. 1014 (1986); *Kirno Hill Corp. v. Hold*, 618 F.2d 982, 985 (2d Cir. 1980); *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1110 (9th Cir. 1979). Conversely, then, Tennessee law would apply where alter-ego liability is premised on state-law causes of action. *See, e.g.*, *Se. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 (6th Cir. 2006) (applying state alter ego law to state law claim brought under the court's diversity jurisdiction).

It is clear under both Tennessee law and federal common law that the Trust cannot be held liable for the actions of Diversified merely because it is the owner (or part owner) of Diversified. *See id.* at 677–78 (noting that under Tennessee law "[m]ere dominion and control of the parent over the subsidiary will not [alone] support alter ego liability" (citing *Cont'l Bankers Life Ins. Co. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979))). The Government, in fact, does not argue to the contrary. (*See* Doc. No. 82, at 29 n.9 (confirming the Government has not attempted to make a claim on that basis).)

Rather, the Government contends that the Trust should be held liable as the alter ego of Carell and has made the following allegations in the Amended Complaint to support that proposition:

> 10.     Defendant James W. Carell Family Trust (the Trust) partly or fully owned Diversified during all times relevant to this complaint. James W. Carell is the sole settler of his namesake trust, which solely benefits his children and their issue. On July 1, 1999, Carell transferred eighty percent of his stock in Diversified to the Trust. On July 1, 2000, Carell transferred his remaining twenty percent stake in Diversified to the Trust. . . .

> 11.     The Defendant Trust constitutes an alter ego of Carell. Carell and the Trust have a unity of interest and have disregarded any separate identity. Following the transfer of Diversified stock from Carell to the Trust, Diversified continued to have substantially identical management, attorneys, business, purpose, operation, equipment, customers and supervision as before. Upon information and belief, Carell continued to work for Diversified and effectively ran the company following its transfer to the Trust. The transfer of Diversified's stock to the Trust, moreover, was not an arms length transaction and, upon information and belief, there was little or no consideration for the transfer. Additionally, the Trust has not maintained an arms length relationship among related entities, such as the related parties discussed below. In short, Carell continued to dominate the Trust's asset – Diversified – even after the transfer of his Diversified stock to the Trust, and Carell has continued to use Diversified as his own instrumentality. If the Trust were not responsible as an alter ego, it would promote injustice.

(Am. Compl. ¶¶ 10–11.) In addition, as the Government points out, the Amended Complaint makes the following allegations the Government contends are material:

- The Trust's Trustee, Douglas Brace, was Carell's longtime agent and attorney, who purchased one of the home health agencies at issue in this case and apparently transferred it to Defendant

Robert Vining.  (Am. Compl. ¶ 35.)

- James Carell and Michael Carell, Trust beneficiary and son of defendant James Carell, signed all checks for the defendant Home Health Agencies and managed their bank accounts.  (Am. Compl. ¶ 41.)

- The FCA and common law claims in this case are predicated on the Trust's status as Carell's alter ego and asserts that the Trust benefited from these transactions.  (Am. Compl. ¶¶ 58, 61, 65–66, 69.)

(*See* Doc. No. 82, at 28–29.)

The Trust does not seriously dispute the proposition that a trust may potentially be liable as the alter ego of its creator.  Instead, the Trust's position is simply that the Amended Complaint does not contain sufficient factual allegations to support application of the alter ego theory to the Trust and Carell under Fed. R. Civ. P. 8 as construed by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1927 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).[3]  Thus, the question this Court must resolve is whether the allegations in the Amended Complaint are sufficient to state a claim for alter ego liability under either federal common law or Tennessee law.

It is not entirely clear to what extent federal law differs from Tennessee law but, to the extent there is any difference between the two, it is likely that Tennessee law would be more exacting.  *See, e.g.*, *Carter Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 746 n.1 (6th Cir. 2001) (noting that federal common law generally "gives less respect to the corporate form than does the strict alter ego doctrine" of state law); *but see In re: Two Springs Membership Club*, 408 B.R. 453, 465 (N.D. Ohio 2009) (holding that regardless of whether state or federal common law applied, "fraud or some injustice is required to . . . find alter ego").  The Court will therefore consider the question under Tennessee law and will presume that the same conclusion obtains under federal law.

There is little law in Tennessee directly concerning alter ego liability in the context of a trust.  Tennessee courts have indicated, however, that the same principles applying to parent and subsidiary corporations would also pertain in the trust context.  *See, e.g.*, *Bracken v. Earl*, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000) (noting the "paucity of authority in Tennessee addressing the issues raised by these types of trust arrangements" but nonetheless affirming the trial court's application of alter ego

---

[3]  The Trust also argues, in a footnote, that the pleading does not satisfy the heightened requirements applicable to allegations of fraud set forth in Rule 9(b), but provides no basis for applying Rule 9(b) to claims based on the alter ego relationship.

liability on the facts before it). In that case, the court noted generally that the factors relevant to application of the alter ego theory of liability "vary according to the circumstances present in each case and the matter is particularly within the province of the trial court." *Id.* (quoting *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)). The court also observed, however, that the factual determination required looking beyond the "organizational documents and surface transactions of the entities involved" to the entities' "economic realities." *Id.* (citing *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); other citations omitted). Relevant considerations included inquiry into who actually controls the earning of the trust's income and the trust's assets, whether the trustees are independent or nothing more than "straw men," whether minimal consideration is given for the owner's transfer of assets to the trust and whether the owner continues to use and control trust assets in order to effect some type of fraud or injustice. *Id.* The *Bracken* court ultimately affirmed the trial court's application of alter ego liability, considering in the trust context the same factors relevant for determining whether a corporate parent should be liable for its subsidiary's acts, that is, whether the subsidiary is a "mere instrumentality of an individual or a parent corporation" and whether failure to disregard the form would result in an injustice. *Id.* (quoting *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985))).

Based on the allegations in the Amended Complaint referenced above, the Court finds that the Government has adequately alleged facts which, if proved, would support recovery against the Trust on an alter ego basis under either state or federal common law. These include the allegations that Carell was the sole settler of the Trust and his family is the sole beneficiary; the trustee is Carell's long time agent; even after the transfer of Diversified's stock to the Trust, the management and business of Diversified did not change, and Carell continued to work for and to run Diversified even after its transfer to the Trust; the transfer of stock was not an arms-length transaction and involved the exchange of little or no consideration; the Trust benefited from the overpayment; and an injustice would be effected if the Trust were not held liable as an alter ego of Carell. The motion to dismiss the claims against the Trust for failure to adequately allege facts supporting an alter ego relationship will therefore be denied.

## IV. CONCLUSION

For the reasons stated herein, the motion to dismiss the FCA claims on statute of limitations

grounds will be denied, and the Trust's motion to dismiss the alter ego claims against it will likewise be denied. The Court will defer ruling on the motion to dismiss the claims for unjust enrichment and payment by mistake, and will instead grant the Government two weeks in which to file a second amended complaint alleging facts that indicate when the final audits and NPRs were issued for the cost reports at issue, if ever, and if they were not issued, why not.

An appropriate Order will enter.



Thomas A. Wiseman, Jr.
Senior U.S. District Judge