**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:09-0445** |
| | ) | **Judge Wiseman/Knowles** |
| **JAMES W. CARELL**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case involves the alleged overpayment of Medicare reimbursements to Defendants. On February 4, 2011, fact discovery closed. Thereafter, the parties filed the following discovery motions:

> (1) The United States' Consolidated Motion to Compel Production of Electronic Documents and Responses to Interrogatories by Defendants (Docket No. 218);
>
> (2) Defendants' Consolidated Motion to Compel Discovery Related to HHS-OIG File 4-93-00138-9 and to Reopen the Personal Deposition of Special Agent Christopher Covington (Docket No. 219);
>
> (3) Defendants' Motion to Compel Responses to Interrogatories Served on the United States Attorney's Office and the FBI (Docket No. 223); and
>
> (4) Defendants' Consolidated Motion to Compel Discovery of Certain Emails (Docket No. 237).

Those Motions have been extensively briefed (Docket Nos. 219-16, 221, 223-1, 235, 238, 243, 249, 250, 251, 256-1, 260, 269, 266 and 273), and will be considered in the order of filing. First, however, the Court sketches the relevant facts to place the Motions in context, and then sets forth the standard which guides the Court's review.

## I. FACTUAL SYNOPSIS

At its core, this case involves billings and eight Cost Reports for the fiscal years 1999, 2000, and 2001, submitted by Defendants VIP Home Nursing and Rehabilitation Services, LLC ("VIP"), Professional Home Health Care, LLC ("Professional"), and University Home Health, LLC ("University") (collectively the "home healthcare entities") for ultimate reimbursement by Medicare.[1] The Costs Reports were submitted between late 1999 and mid-2002.

Plaintiff alleges that, for many years, Defendant Robert Vining was the "sham owner" of the home healthcare entities, and the entities were actually under the control of Defendant James W. Carell and his company, Defendant Diversified Health Management Inc. ("Diversified"). Defendant Careall, Inc., formally bought the home healthcare entities in December 2002, and is allegedly the alter-ego of Mr. Carell.[2]

The alleged arrangement between Mr. Carell and Mr. Vining allowed Mr. Carell and his companies to evade a rule that limited a home health agency owner's compensation, but not the fees of a management company. The Government's theory is that, in submitting the Cost Reports, Defendants violated the False Claims Act ("FCA"),[3] 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), because they improperly billed Medicare for the large management fees of Diversified, a related party of the home healthcare entities, all the while concealing the fact that Diversified was a related party.

## II. <u>STANDARD OF REVIEW</u>

---

[1] The Cost Reports were actually submitted to Palmetto Government Benefit Administrators, LLC ("Palmetto") which served as a fiscal intermediary and administered the Medicare program for home health and hospice benefits in Tennessee.

[2] Mr. Carell, Careall Inc., and Diversified will collectively be referred to as the Careall Defendants.

[3] In addition to the FCA, the Government brings common law claims for "payment by mistake of fact" and unjust enrichment.

Under the Federal Rules, a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1). "Relevancy for discovery purposes is construed broadly" and "[d]iscoverable evidence need not be admissible at trial; rather, material is discoverable if it is 'reasonably calculated to lead to the discovery of admissible evidence.'" <u>Anderson v. Dillard's, Inc.</u>, 251 F.R.D. 307, 309 (W.D. Tenn. 2008). Nevertheless, "[t]he scope of discovery is, of course, within the broad discretion of the trial court." <u>Lewis v. ACB Bus. Servs., Inc.</u>, 135 F.3d 389, 402 (6th Cir. 1998).

If a party fails to respond appropriately to a discovery request, the party seeking discovery may move for an order compelling production. Fed. R. Civ. P. 37(a)(3). In doing so, the moving party "must demonstrate that the requests are relevant to the claims or defenses in the pending action." <u>Anderson</u>, 251 F.R.D. at 309-310. If relevancy is shown, "the party resisting discovery bears the burden of demonstrating why the request is unduly burdensome or otherwise not discoverable under the Federal Rules." <u>Id</u>. at 310.

Further, Fed. R. Civ. P. 37(a)(1) provides that a Motion to Compel "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." The salutary purpose of the rule is to eliminate the need for the Court to expend scarce resources on discovery disputes which can be amicably resolved. <u>See</u>, <u>Andrews v. Davis</u>, 2011 WL 195569 at *1 (E.D.N.C. Jan. 19, 2011) ("This Court, like many others, has limited resources and many demands" and Rule 37(a)(1) attempts "to ensure the most efficient allocation of those resources"); <u>Wilhelm v. Cain</u>, 2011 WL 128568 at *3 (N.D.W. Va. Jan. 14, 2011) (citation omitted) ("'When the court must resolve a dispute that the parties themselves could have resolved, it must needlessly

expend resources that it could better utilize elsewhere").

## III. DISCUSSION

**A.  United States' Motion to Compel Production of Documents and Responses to Interrogatories Relating to E-Discovery (Docket No. 218)**

   **1.** *Summary of the Parties' Positions*

By way of this Motion, the Government seeks to compel responses to certain of its discovery requests and interrogatories relating to electronic documents.[4]  It claims that during the more than fourteen months of discovery in this case, it served 11 document requests on the home healthcare agencies, 10 interrogatories and 12 document requests on Mr. Carell, and 8 interrogatories and 14 document requests on Careall, Inc., but that the Defendants have failed to produce a single electronic document in response.  Notwithstanding Defendants' claims to the contrary, the Government believes responsive electronic discovery may exist.  They also assert that Defendants  failed to implement a litigation hold or comply with this Court's Administrative Order 174 and that, had Defendants done so, evidence may have been preserved.  The Government views the failure to implement a hold as inexcusable because, from October 2005 until April 2008, the United States served the Defendants with more than 10 administrative subpoenas, which repeatedly triggered Defendants' obligation to implement appropriate litigation holds.  In light of what it characterizes as "egregious discovery violations," the Government asks the Court to compel Defendants to: (1) conduct an adequate search of their electronic systems for documents responsive to the United

---

[4]The Court notes that, in the Memorandum accompanying its Motion (Docket No. 221), the Government also argues that Defendants should be compelled to produce documents responsive to the Government's Document Request Numbers 4 and 5.  To the extent those requests are not otherwise encompassed in this Court's ruling on the Government's Motion to Compel electronic discovery, the Court does not separately consider the same because there is no indication the Government has complied with Local Rule 37.01(b)(3)'s "meet and confer" provision, the Joint Written Statement of Discovery Issues (Docket No. 222) does not address those Requests, and the Requests are not a part of the Motion to Compel.

States' discovery requests and interrogatories; (2) certify that they have performed such a search; and (3) produce any responsive electronic documents. Docket No. 218 at 1-2.

In response, Defendants state that none of the Defendants to whom e-discovery requests have been made had on-line electronic capability until August 29, 2003, almost two years after the years of the Cost Reports at issue, a fact well-known to the Government.[5] Therefore, Defendants contend that the Government is requesting the production of documents which do not exist. Defendants also argue that, even though the latest Cost Report was for 2002, the Government seeks documents from at least 1999 to 2011 – more than twelve years worth – even though the complaint sets forth wrongful conduct for the years 1999 to 2001. As for the litigation hold issue, Defendants argue that even if the Government's position that Defendants had an obligation to maintain electronically stored information because they were on notice of possible litigation as of October 2005, is credited, that date itself is close to four years after the end of the last year at issue in the Cost Reports.[6] Finally, Defendants insist that they cannot be faulted for failing to comply with Administrative Order 174 since the Government, too, failed to comply with that Order.

**2.** *Analysis*

In their Joint Statement of Discovery Issues (Docket No. 222), the parties set forth three questions. First, what is the relevant time period for discovery and is information for the years

_____

[5]Defendants contend that, even though the initial complaint was filed on May 18, 2009, the Government only first raised questions about the production of emails in letters of September 29 and October 6, 2010. When those questions were raised, Defendants promptly informed the Government that none of the home healthcare agencies had email until August 29, 2003, and the general policy was that retention of emails was a matter of individual choice. Because of that, Defendants informed the government that no emails responsive to the request were known to exist.

[6]Defendants further point out their emails were hosted by an external and independent company called ICG Link and, through no fault of the Defendants, the ICG Link server crashed in 2009, resulting in the loss of some backed-up data. The Government argues that if Defendants had implemented a litigation hold as they should have, potentially relevant documents would not have been destroyed during the crash.

beyond 2001 relevant and reasonably calculated to lead to the discovery of admissible evidence? Second, did the Defendants adequately implement a litigation hold sufficient to preserve relevant documents? Third, have the Defendants sufficiently searched their files and electronic systems for relevant electronic information and produced such information to the United States?

Having considered the parties' positions on the scope of discovery, the Court concludes that the Government's position is too broad and Defendants' too narrow. As already indicated, under Rule 26, a party is entitled to discover information relative to a claim or defense reasonably calculated to lead to the discovery of admissible evidence.

The crux of the Government's case is that the home healthcare entities purportedly owned by Mr. Vining were actually controlled by Mr. Carell and his companies and, thus, Diversified was not an unrelated party entitled to management fees. That claim, however, involves Cost Reports for the years 1999 to 2001, and the Government fails to offer any convincing arguments as to why electronic documents nearly a decade after the last Cost Report are relevant or would lead to the discovery of relevant evidence.

On the other hand, the Court is unpersuaded by Defendants' argument that potentially relevant evidence necessarily ceased to exist after the actual submission of the last Cost Report in 2002 and/or the "sale" of the home healthcare entities to Mr. Carell in December 2002. In their response brief, the home healthcare entities cite D'Onofrio v. SFX Sports Group, Inc., 256 F.R.D. 277 (D.D.C. 2009) for the proposition that the existence of relevant evidence six months after an event is "exceedingly unlikely." Docket No. 235 at 7. D'Onofrio, however, involved an employment termination claim in which the court recognized that "[t]here is always some degree of imprecision in determining the appropriate temporal scope of discovery in wrongful termination"

and drew the line at six months because "the more time that elapses between defendant's being fired and the action she claims shows that the reason given is pretextual, the less permissible is the inference that the action was pretextual." Id. at 280 and 281.

More on point is Daval Steel Prod. v. M/V Fakredine, 951 F.2d 1357 (2nd Cir. 1991), a case involving plaintiffs' allegations that an alter-ego relationship existed among some of the defendants. The plaintiffs sought discovery for the years 1984 to 1988, even though the "sale" at issue occurred in 1987. After defendants failed to comply with discovery requests and sanctions were imposed, defendants argued on appeal that "'alter ego' liability is properly determined as of the time of the transaction at issue'" and, therefore, any records and documents from the years after the transaction were not discoverable. In rejecting that argument, the Second Circuit observed that, "it was reasonable to conclude, as the district court did, that information from subsequent years could help piece together the earlier picture" and "that information concerning financial transactions and movements of corporate assets subsequent to the transaction giving rise to this litigation was 'reasonably calculated to lead to the discovery' of evidence admissible on the issue of alter ego liability within the meaning of Rule 26(b)(1)." Id. at 1368.

Similarly in this case, information from years after the last Cost Report and the purchase of the home healthcare entities "could help piece together the earlier picture" of the relationship between Mr. Carell and Mr. Vining. The question really is how long that picture remained in focus after Mr. Carell and his companies became the named owners of the home healthcare entities. This necessarily involves a judgment call. As the court in D'Onofrio explained:

> A judge must simply draw a reasonable line between the likely and the unlikely, the discoverable and the prohibited, the wheat and the chaff. As the Supreme Court stated in another context: "If in its theory the distinction is justifiable, as for all that we know it is, the fact that some cases, including the

plaintiff's are very near to the line makes it none the worse. That is the inevitable result of drawing a line where the distinctions are distinctions of degree; and the constant business of the law is to draw such lines." Dominion Hotel v. Arizona, 249 U.S. 265, 268-69, 39 S.Ct. 273, 63 L.Ed. 597 (1919) (Holmes, J.). . . .

All one can do is weigh probabilities against probabilities, barring discovery whose likely benefit is outweighed by its cost considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the controversy and the importance of the discovery in resolving the issues. Fed.R.Civ.P. 26(b)(C)(iii).

D'Onofrio, 256 F.R.D. at 280-81.

After weighing the probabilities, the Court draws the line for e-discovery related to the relationship between Mr. Vining and Mr. Carell at December 31, 2005 – some three years after the sale and final Cost Report, and two years after Defendants had email. In the Court's view, there may have been communications or documents that were created during the years immediately after the sale which could shed light on the relationship. The Court believes, however, that the snapshot of the pre-sale relationship would have faded by the end of 2005.

That leaves for consideration the remaining two questions presented by the parties' Joint Statement, namely (1) Did the Defendants adequately implement a litigation hold sufficient to preserve relevant documents? and (2) Have the Defendants searched their files and electronic systems for relevant electronic information and produced such information to the United States? As will be seen, the Court concludes that no answer is appropriate at this point in time, notwithstanding that the parties address the questions in detail in their briefs.

"As a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including ESI,[7] when that party 'has notice that the evidence is

---

[7]Electronically Stored Information.

relevant to litigation or ... should have known that the evidence may be relevant to future litigation.'" John B. v. Goetz, 531 F.3d 448, 459 (6th Cir. 2008) (*quoting* Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2nd Cir.2001) (footnote added). "It is the responsibility of the parties to ensure that relevant ESI is preserved, and when that duty is breached, a district court may exercise its authority to impose appropriate discovery sanctions." Id.[8]

Additionally, this Court's Administrative Order 174 sets forth "default standards" in cases where the parties do not reach agreement on how to conduct e-discovery. That Order contains a provision relating to the retention of documents whereby the parties are directed to attempt to reach an agreement regarding how they will undertake the segregation and preservation of all relevant electronically stored information.

In this case, the Court does not understand Defendants to be arguing that they placed any sort of effective litigation hold in place, or that they followed Administrative Order 174. Rather, their argument is that a litigation hold was unnecessary for electronic documents because they believed that the relevant period for discovery pre-dated the home healthcare entities computer access, and they had no computer access until the latter part of 2003. As for the Administrative Order, they argue that the parties never conducted the conference or reached an agreement as to e-discovery as contemplated by the Order.

By taking those positions, Defendants ran the risk of being wrong and the possibility of any of a number of sanctions. See, Beaven v. United States Dept. of Justice, 622 F.3d 540, 553-54 (6th

---

[8] The "obligation to preserve evidence runs first to counsel who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." Zimmerman v. Poly Pre Country Day Sch., 2011 WL 1429221 at *15 (E.D.N.Y. Apr. 13, 2011) (quotation marks omitted) (collecting cases). Once the litigation hold is in place, "a party and its counsel must make certain that all sources of potentially relevant information are identified and placed 'on hold'[.]" Id. (italics in original).

Cir. 2010) (collecting cases discussing various sanctions for spoliation of evidence). That said, however, the Court is not called upon to address any potential sanctions at this time and, in any event, would be unable to do so given the present state of the record.

In this regard, the Court does not know whether any documents exist that are relevant to the Government's e-discovery requests. But a party "cannot be expected to produce documents which do not exist." <u>Williams v. Schueler</u>, 2006 WL 1728123 at * 2 (E.D. Wis. June 23, 2006). Nor is the Court in a position to determine at this time such issues as whether Defendants have a reasonable explanation, or acted willfully or in bad faith in failing to produce responsive e-discovery (assuming it exists). <u>See</u>, <u>Bessemer v. Lake Erie R.R. Co. v. Seaway Marine Trans.</u>, 596 F.3d 357, 370 (6th Cir. 2010) (discussing factors to be considered in determining appropriate sanctions). Thus, the Government's off-hand statement in the concluding paragraph of its brief that the Court order that an adverse inference instruction be given – prompting the Careall Defendants to discuss at length the impropriety of such an instruction (Docket Nos. 221 at 22, and 249 at 14-16) – is simply not an issue properly before the Court.

More fundamentally, in its Motion, the Government does not request anything other than the production of electronic documents responsive to its document requests and interrogatories. It wants the Defendants to search their electronic systems for documents, certify that they have made the search, and produce any documents that result from such a search. That is all the Government requests, and that is all that is before the Court.

Finally, in determining that Defendants shall be required to search for, and produce e-discovery in accordance with the Government's Motion, the Court acknowledges that the Careall Defendants have indicated they have conducted "countless diligent searches and turned over all

responsive documents to the Government" (Docket No. 249 at 9), and also that the home healthcare agencies have indicated that the Government was informed by counsel that management was unaware of any emails that would be responsive to the Government's discovery requests. (Docket No. 235 at 2-3). Saying emails do not exist, however, is not the same thing as certifying that a search for such documents has been conducted. Nor is a representation that all responsive documents have been turned over particularly convincing when the Defendants have taken the position that nothing after 2002 is relevant. In any event, if the Defendants have diligently searched for responsive e-discovery, then compliance with the Court's Order should be relatively easy.

**B. Defendants' Motion to Compel Discovery Related to OIG File and to Reopen Deposition (Docket No. 219)**

   **1.** *Summary of the Parties' Positions*

This Motion relates to the Government's belated production of file 4-93-00138-9 ("4-93 File") of the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS"). The Careall Defendants claim that, at least since June 2010,[9] they have inquired about the existence of the 4-93 File, but were informed by the Government that the file was destroyed and, in any event, was not an investigation involving related party allegations. On the afternoon of January 27, 2011, one week before the close of discovery, however, the Government produced the file. Defendants contend that upon reviewing the 4-93 File, it is clear that the file concerns the "exact same related party allegations that the United States brings forward in its Second Amended Complaint," and that this is important because, since the outset of this case, Defendants have

---

[9]Defendants discovered the existence of the file during review of initial disclosures which indicated that Palmeto had communicated with the OIG about an investigation into Diversified, Maximum a/k/a VIP, Professional, and University, and that the OIG had referred the investigation surrounding the 4-93 File to the Federal Bureau of Investigation.

maintained the statutes of limitations found in 31 U.S.C. § 3731(b) and 28 U.S.C. § 2145(a) bar the Government's FCA claims. Docket No. 219-16.

With regard to the belated discovery of the 4-93 File, Defendants note that Agent Christopher Covington testified during his personal deposition on May 20, 2010 that the file had been destroyed in 2005, and that no effort was made by him to prevent the destruction of the file. While the Government has indicated that it determined (incorrectly) that the file was destroyed on May 10, 2010 (five days before Agent Covington's first deposition), Defendants believe the file may have been available at the time Agent Covington began his investigation, and that he may have been untruthful in his deposition testimony about the file. Defendants, therefore, propounded interrogatories requesting information about who Agent Covington talked to regarding the destruction of the 4-93 File. On January 27, 2011, the day before responses were due, Defendants received an email from Kristen Adcock, a Government paralegal, which attached the 4-93 File.

In response, the Government claims the 4-93 File is simply not relevant to the statute of limitations defense because there is no reference in it to the Department of Justice or United States Attorney's Office; there is no indication that any conversations were had with, or attachments sent to, the FBI; the OIG "did practically no investigation of the Maximum matter"; and the file was opened in 1993, closed in 1994, and contains no allegations about conduct occurring after that time. Docket No. 251 at 4. As for the belief that the file had been destroyed, the Government states that, on May 5, 2010, Agent Covington emailed Kellie Wright (who was the contact person at HHS-OIG for records retrieval) and asked her if the file could be retrieved from the Federal Records Center. Ms. Wright responded that it could not, believing that, because the file was closed in 1995, it was destroyed in 2005 in accordance with HHS' records retention policy. The Government further

asserts that Agent Covington testified truthfully in his deposition, since he never said when the 4-93 File was destroyed.

As it turns out, the 4-93 File was not destroyed because it was subject to a litigation hold. This was revealed when counsel for the Government contacted Ms. Wright in early January 2011 regarding documentation that the file had been destroyed. Ms. Wright contacted HHS-OIG headquarters and learned, on January 19, 2011, that a litigation freeze in a tobacco case covered the file. Ms. Wright then submitted an emergency request to the Federal Records Center and received the file on January 26, 2011, overnighting it to counsel for the Government that same day. As noted, the file was emailed to Defendants on January 27, 2011.

### 2. *Analysis*

In their Joint Statement of Discovery issues, the parties identify several issues relative to the Motion to Compel involving the 4-93 File that require resolution by the Court. Summarized, those issues involve Defendants' requests that: (1) the Government produce Agent Covington's contact sheets, notes, logs, and documents surrounding Agent Covington's efforts to find, and the subsequent discovery of the existence the 4-93 File; (2) Agent Covington identify any person on whom he relied when he testified in his deposition that the 4-93 File had been destroyed, as well as the identity of any persons subsequently relied upon by that person in informing Agent Covington about the destruction; (3) the Government produce documentary evidence showing the date on which Palmetto's 1993 letter was produced by Palmetto to the United States; (4) the Government produce the electronic version of Ms. Wright's May 5, 2010 email to Agent Covington; and (5) Agent Covington's deposition be reopened on the limited topic of the 4-93 File. (Docket No. 220).

In their respective briefs, the parties spend a good deal of time discussing whether the 4-93

File is relevant to Defendants' position that this action is barred by the statute of limitations. This protracted discussion is unnecessary.

As Judge Wiseman noted in a hearing on October 12, 2010 (the substance of which will be discussed in detail in the next section), the issue of the statute of limitations is very much alive and undoubtedly will be the subject of a Motion for Summary Judgment by Defendants. It is also an issue that is for Judge Wiseman, not the parties, to decide. That said, the question of whether the 4-93 File aids Defendants' statute of limitations defense is simply not relevant to the question presented by the Motion to Compel which, in essence, seeks information about *how* the discovery of that file came about.

Turning to what is relevant, the Government argues that Defendants' Motion to Compel is improper because they have not sought the information through a formal discovery request, but instead requested "new documentation" by letter some three weeks after fact discovery closed. (Docket No. 251 at 12). Relatedly, the Government claims that Defendants, while "implicitly seeking to amend the scheduling order to permit more fact discovery" "have failed to make a formal motion to do so under Rule 16" (id. at 14), and have failed to show good cause for any such modification as required by the Rule.

The Government's argument effectively ignores the sequence of events surrounding the late production of the 4-93 File. By all accounts, the file was produced to Defendants just one week before the close of discovery. While the Government faults Defendants for not making a formal discovery request in relation to the production of the 4-93 File,[10] the Government does not take into

---

[10]It is important at this point to note that Defendants did seek information early-on about prior investigations, and the suggestion of the existence of another filed dates to at least the initial disclosures in November 2009 when the Government produced letters referencing an HHS-OIG investigation into Maximum.

account that, even if Defendants could somehow have made formal production requests or interrogatories on the very day they received the file, the Government would not have had time to respond to the requests before the close of discovery.  See, United Consumers, Club, Inc. v. Prime Time Mkt'g., 271 F.R.D. 487, 490 (N.D. Ind. 2010) ("Generally, the discovery deadline specifies the date on which all discovery must be completed, therefore, any document requests must be served at least 30 days prior to the discovery deadline.").

Moreover, while Defendants did not file a formal motion to amend the Scheduling Order, to the extent they are "implicitly" attempting to do so, that attempt is not barred by the absence of such a motion.  Under Local Rule 16.01, "the case management judge may modify a case management order," and that may be done either "[u]pon motion of any party or sua sponte." L.R. 16.01(d)(4).  Further, under Fed. R. Civ. P. 16(b))4), "a schedule may be modified only for good cause and with the judge's consent," Fed. R. Civ. P. 16(b)(4), with "[t]he primary measure of Rule 16's 'good cause' standard"  being "the moving party's diligence in attempting to meet the case management order's requirements."  Inge v. Rock Finan. Corp., 281 F.3d 613, 625 (6th Cir. 2002).


Finally, the Government argues that Defendants' Motion should be denied because the parties "did not engage in a meaningful meet and confer in an attempt to resolve this dispute." Docket No. 251 at 14.  This Court's Local Rules, in accordance with Federal Rule 37(a), require that when a party moves to compel, the motion shall be accompanied by a statement which indicates that moving counsel "has conferred with counsel for the opposing party in a good faith effort to resolve by agreement the issues raised and that counsel have not been able to do so." L.R. 37.01(b)(2)(c).  In the case at bar, the Motion is accompanied by the required certification.  In the Joint Statement

of Discovery Issues, counsel for the Government and the Careall Defendants represented that, "[c]ounsel for the parties met and conferred in good faith on these issues by phone on March 4, 2011 and exchanged letters dated February 17, 2011, and February 25, 2011 on the matter," and further that, "[t]he parties reached an agreement on 2 of the matters that they had disagreed about," but were unable to resolve the other discovery issues[.]" Docket 220 at 1. The Court will not question this representation and engage in an analysis of whether the exchanges were "meaningful."

In light of the foregoing, the Court concludes the Careall Defendants are entitled to limited discovery on the facts and circumstances surrounding the discovery of the 4-93 File. The Defendants will be required to submit production requests and/or interrogatories, and the Government will be required to respond and/or produce discovery relative to: (1) any notes taken by Agent Covington regarding his efforts to locate, and the subsequent discovery of, the 4-93 File; (2) the notes of any phone calls Agent Covington made in his effort to locate or verify the existence or non-existence of that file, including any phone logs, or notes of conversations; (3) copies of any contact sheets made regarding Agent Covington's efforts to locate the file or verify its existence; and (4) the identity of any person(s) Agent Covington relied upon in stating in his deposition testimony that the 4-93 File had been destroyed. Additionally, Defendants will be allowed to reopen the personal deposition of Agent Covington for the limited purpose of inquiring abut the 4-93 File, his efforts to locate that file, and the subsequent discovery of that file.[11]

The Court will deny Defendants' Motion to Compel insofar as they seek to have Plaintiff

_____

[11]The Court disagrees with the Government's assertion that allowing Agent Covington's deposition to be reopened for this limited purpose will allow the Defendants to engage in "yet another fishing expedition," and allow them to take yet another "bite at the apple" in order to make Agent Covington "look bad." Simply put, Defendants did not have a fair opportunity to ask Agent Covington questions about the file and its recent discovery and they are entitled to make that inquiry.

produce documentary evidence showing the date on which Palmetto produced a letter to the United States. The Court will also deny the Motion to the extent it seeks the electronic version of Ms. Wright's May 5, 2010 email.

With regard to the former, the Joint Statement indicates that "Defendants request documentary evidence showing the date on which the letter Bates labeled #003786 was produced by Palmetto to the United States." (Docket No.220 at 3). That letter, which is attached to Defendants' Motion, is correspondence dated April 9, 1993 from Jim Peebles, a Medicare Audit Manager, to Dana James at the OIG. In its response brief, however, the Government indicates that the very same letter was produced to the Defendants as a part of the Government's initial disclosures on November 4, 2009. Since the Defendants had the letter in November 2009, any information about when the Government received the letter should have been requested long before discovery closed.

As for Ms. Wright's email, the Government has indicated that Defendants have received a hard copy of the email. Defendants offer no persuasive reasons as to why they need the electronic version of the email as well.

## C. Defendants' Motion to Compel Responses to Interrogatories (Docket No. 223)

### 1. *Summary of the Parties' Positions*

This Motion involves Defendants' request that the Government be compelled to correctly and completely answer Careall Inc.'s First Set of Interrogatories, specifically Interrogatories 2-10, 13-17, 21-24, 34-36, and 48. For the most part, those interrogatories relate to the general practices and procedures of the FBI and the United States Attorney's Office for the Middle District of Tennessee for handling claims of healthcare fraud.

Defendants argue that, although the Government has answered those interrogatories, it has done so by asserting boilerplate objections and indicating that usual practice or procedure involves a "case-specific" determination. Defendants view these answers as non-responsive and request proper answers in light of their claim that the statute of limitations bars this action. Defendants state that the interrogatories are a "potential middle road solution" to the Government's objection to Defendants' earlier efforts to depose certain FBI agents and Assistant United States Attorney ("AUSA") Mike Roden. Docket No. 223-1.

The Government responds that it has fully answered the interrogatories, or properly refused to answer based upon relevance and privilege grounds. In doing so, the Government has indicated that it has attempted to resolve the dispute amicably and worked "in good faith to reach what may have been a first-of-its-kind compromise in this District on both written discovery and depositions concerning the FBI and the USAO[.]" Docket No. 243-1 at 2. The Government also contends that Defendants have not complied with the requirement of a joint written statement as required by Local Rule 37.01.

### 2. *Analysis*

The present dispute stems from Defendants' earlier efforts to depose FBI Agents and AUSA Mike Roden. After the undersigned granted the Government's Motion to Quash and For a Protective Order in relation to the noticed depositions of those individuals, Defendants filed objections. Judge Wiseman held a lengthy hearing on October 12, 2010 about the depositions, and, more generally, about how Defendants could go about obtaining information regarding the general practices and procedures of the FBI and United States Attorney's Office in relation to healthcare fraud investigations. The gist of Judge Wiseman's remarks during the hearing was that the parties

should work to resolve their differences.

In suggesting that the parties reach a compromise, Judge Wiseman made several comments that are pertinent to the present dispute. At the start of the hearing, Judge Wiseman directed his comments specifically to Government's counsel, stating:

> THE COURT: All right, let me begin by making a few remarks. This Court has a well-deserved reputation for requiring open discovery, broadly open discovery. And exceptions -- work product, privileges are narrowly construed in this court. And we do not play hide the ball. I say that for the benefit of you, Mr. Kennedy and Ms. McIntyre and Ms. Lynch. Nothing that this Court has ruled on so far fixes the date upon which the responsible person in the Department of Justice knew or should have known of the investigations of these Defendants. That is going to be a key question to be determined. As Howard Baker put it in the Watergate investigation, what did you know and when did you know it? That is what we are going to find out. And you are going to be allowed discovery to find it out.
>
> And I am not impressed at all, Ms. Lynch, or Ms. McIntyre, by your assertions of work product on cases on investigations that occurred ten years ago, your assertions of harm to the Government for cases that have been closed by the FBI for years.
>
> Now, with these statements telling you how high the bar is for you to jump over on these questions, I will hear you, Ms. McIntyre, or, Ms. Lynch, or, Mr. Kennedy.

Tr. of Hr'g, Docket No. 195 at 1-2. Judge Wiseman also informed the Government that it was not the one to determine whether information was relevant to the statute of limitations defense, or what was privileged, because those were questions for the Court. Id. at 10-11.

At the hearing, defense counsel indicated that they were not "trying to get any sort of litigation strategy or secrets," but just wanted to know what the general practice was from the mid-1990's until 2002.[12] Judge Wiseman stated that Defendants should submit written interrogatories

---

[12]Specifically, counsel indicated that Defendants wanted to know such things as: "if the FBI gets a letter from the Inspector General of the Regional Office of the HHS-OIG what are their ususal procedures," and was it "their usual procedure to open an investigation?"; "when the FBI opens a case do they look in the FBI data base, and ... see, well, we are investigating this agency[?]"; "generally what are the FBI procedures to open and close a case?"; "is it the

to elicit such information and the parties should reach some sort of an agreement, otherwise he "was going to be terribly upset" and would "talk about going to oral deposition." <u>Id</u>. at 20-21, 42, 44-45. Judge Wiseman also stated that he would not countenance "stonewalling," or "overly broad" objections or assertions of privilege, and that, while he "did not know enough about the case to make decisions about these things, . . . I do smell a rat." <u>Id</u>. at 41-42. Finally, Judge Wiseman instructed the parties they should "narrow the controversy considerably," and reminded the Government that "broad general objections like work product and executive privilege don't cut it." <u>Id</u>. at 46-47.

It is against this backdrop that the Court is presented with Defendants' Motion to Compel answers to the interrogatories. Roughly, the disputed interrogatories can be divided into three categories. The first category is interrogatories directed at FBI procedures from 1993 through 2002 ("FBI Interrogatories"); the second is those relating to procedures utilized by the local United States Attorney's Office for the same time period ("United States Attorney Interrogatories"), and the third involves a single interrogatory related to the Government's denial of Requests for Admission. Before discussing these categories, however, the Court, once again, addresses the Government's overall contention that Defendants have failed to comply with the requirement that the parties meet and confer prior to submitting a discovery issue to the Court.

In its response brief, the Government argues that, while "the parties exchanged letters about some of the issues raised in the motion to compel on February 2nd and 14th , 2011 . . . [t]here was no actual conversation on these issues" until Defendants' emailed a Joint Statement of Issues for the Government's review on March 4, 2011. Docket No. 243 at 3. The Government further states that,

---

procedure of the United States Attorney's Office to get any sort of update or brief on a concurrent criminal investigation when they are litigating a civil case?"; and "when it comes to specific individuals, did [FBI] Agent McFarland, in fact, review the full file of VIP, as he said he did?", "[i]f so does he recall anything about the related party issue?" "[w]hat were his usual practices specifically?" <u>Id</u>. at 17-19.

"[d]espite the fact that this was the United States' first notice of Defendants' desire to file a motion to compel on this issue and that the United States' counsel was extremely busy that day, counsel squeezed in a brief meet and confer phone call with [Defendants' counsel] and endeavored in a hurried fashion to submit the United States' portion of the joint statement." Id. at 4.

Regardless of whether Government's counsel was harried on March 4, 2011, counsel signed a Joint Written Statement of Discovery Issues. Just like the statement previously mentioned, that joint written statement specifically represented that, "[c]ounsel for the parties met and conferred in good faith on these issues [related to the interrogatories] via phone on March 4, 2011 and exchanged subject letters on the subject[.]" (Docket No. 224 at 1). Thus, the Court will discuss the interrogatories.

### *a.* FBI Interrogatories

These interrogatories seek information regarding the general practice and procedure from 1993 to 2002 of the Nashville office of the FBI in regard to investigating healthcare fraud claims. Specifically, interrogatories 2-6 seek information relating to the general procedures utilized when the FBI received referrals from the OGI; interrogatories 7-8 and 13-14 seek information regarding the office's procedures for documenting actions taken in relation to referrals and conducting searches for related parties; interrogatories 9-10, 15-16 , and 21-24 seek information regarding the office's procedures in sending copies of fraud allegations to, or consulting with, the United States Attorney's Office when opening, closing, or deciding not to pursue a case; and interrogatories 17 and 23 request information about the office's procedures for consulting with third party intermediaries, such as Palmetto, in relation to Medicare healthcare fraud claims.

The Government has not responded to these interrogatories, other than to state that no

general standards were used and the practices utilized were "case specific." In the Court's view, such answers are deficient. It seems likely that there must have been some general guidelines that the agents followed, and that, even if there was no official, sanctioned, standard practice, some kind of usual practice was followed. Because of this, the Government will be given the opportunity to supplement its responses to these interrogatories. If it chooses to stand by the answers already given, Judge Wiseman may decide to "talk about going to oral depositions."

In arriving at this decision, the Court has considered the various arguments raised by the Government and finds them unpersuasive. For example, the Government argues that the depositions of several FBI agents demonstrate that the answers it gave to the interrogatories were responsive, to wit, that there were no standard practices or general procedures. The Government cites excerpts from those depositions in support, but Defendants cite deposition excerpts that suggest the opposite. Regardless, the FBI depositions were personal depositions, and the Government was quick to object to anything beyond the witness' personal experience and instructed witnesses not to answer questions about FBI policy.

The Government also argues that any information about the standard practices and procedures is protected by the work product doctrine and the investigative files/law enforcement privilege. Neither, however, bars the present inquiry into general practices and procedures of the local FBI practice ten to twenty years in the past.

"[T]he work product doctrine generally protects from disclosure documents prepared by or for an attorney in anticipation of litigation." Reg. Airport Auth. of Louisville v. LFG, LLC, 460 F.3d 697, 713 (6th Cir. 2006). A document is prepared in anticipation of litigation if it was prepared or obtained because of the prospect of litigation, and "will not be protected if it would have been

prepared in substantially the same manner irrespective of litigation." <u>United States v. Roxworthy</u>, 457 F.3d 590, 593-94 (6th Cir. 2006). Here, the information about standard practices or procedure of the FBI office in Nashville would appear to be the same regardless of whether litigation was anticipated.

The investigative files/law enforcement privilege was first recognized by the Supreme Court in <u>Rovairo v. United States</u>, 353 U.S. 53, 59 (1957). In <u>Rovairo</u>, the Court held that the government has a qualified privilege to withhold the identities of confidential informants. Since then, that privilege has been expanded beyond the identities of confidential informants to include protecting investigative files in ongoing criminal proceedings and to investigative techniques. <u>See</u>, <u>Commonwealth of Puerto Rico v. United States</u>, 490 F.3d 50, 63 (1st Cir. 2007). Still, "the law enforcement privilege is bounded by relevance and time constraints," and, "[t]herefore the privilege lapses either at the close of an investigation or a reasonable time thereafter[]." <u>In re Dept. of Homeland Sec.</u>, 459 F.3d 565, 571 (5th Cir. 2006). Given that the present interrogatories are directed at the standard practice of the local office of the FBI from 1993 to 2002, the investigative files/law enforcement privilege is inapplicable.

### *b.* United States Attorney Interrogatories

Defendants have also propounded three interrogatories regarding the usual practice of the United States Attorney's Office from 1995 to 2002. Defendants ask for a detailed description of the procedures and usual practice for any member of the office: (1) to receive updates on open cases (interrogatory 35); decline prosecution of a case (interrogatory 36); and close a case (interrogatory 37).

These interrogatories are overly broad and unduly burdensome. This case concerns a

Medicare home healthcare fraud matter dating back to the early 2000's, but Defendants seek information covering both civil and criminal cases from "any member" of the office during an eight year period.

Further, the interrogatories seek information covered by the deliberative process privilege which protects "opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975).[13] It also seeks information that goes to the thought process of individual Assistant United States Attorneys and is therefore protected by the work product doctrine. See, United States v. Nobles, 422 U.S. 224, 238 (1975) ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.").

### c. Request for Admission Interrogatory

Finally, the Government refused to respond to interrogatory 48. That interrogatory requests that the Government "identify every fact, act, event, communication, omission, and document related to" the Government's denial of any of Careall Inc.'s First Requests for Admissions. The Government denied, in whole or in part, 23 of those requests.

The Federal Rules limit the number of interrogatories to 25 (including discrete subparts), unless otherwise ordered by the Court or agreed upon by the parties. Fed. R. Civ. P. 33(a)(1). The Local Rules require that leave of Court be sought before submitting more than 25 interrogatories (L.R. 37.01(b)). Here, while the Government did "not object to interrogatory questions . . .

---

[13]To qualify for the privilege, information must be both pre-decisional, meaning that it is used by an agency decisionmaker to arrive at a decision, and deliberative, meaning that it is the type of information, the release of which, could discourage candid discussions within the agency. Honsermeiver v. C.I.R., 621 F.3d 890, 904 (9th Cir. 2010). An individual AUSA's decision to prosecute or not, or to recommend a prosecution or not, meets those criteria.

exceeding the 25 interrogatory limit as a general matter," it did state that it would "object to any interrogatories that are burdensome." Docket No 223-10. Given this, it cannot be said that the Government agreed to respond without objection to almost twice the number of interrogatories allowed by the rules, let alone that it would not object to answering 48 interrogatories, including one which effectively contains 23 subparts. This portion of the Motion to Compel will be denied.

## D. Defendants' Motion to Compel Discovery of Emails (Docket No. 237)

### 1. *Summary of the Parties' Positions*

In this Motion, Defendants request that the Government be required to produce 37 emails or email strings by and between various Palmetto employees. Those emails are dated from August 23, 2005 to October 4, 2005, and the Government has withheld them on the basis of the work product doctrine. Apparently, these dates are significant because Agent Covington testified in his deposition that he first referred this case to the Criminal Division on August 22, 2005, and referred it to the Civil Division on October 4, 2005.

In refusing to produce the emails, the Government claims the disputed emails were created in anticipation of litigation and are protected work product. This is because the Palmetto employees who authored the emails were ostensibly working at the direction of an agent for the United States, and, contrary to Defendants' position, the proper standard for analyzing work product protection here is that revolving around a criminal investigation, not that under the False Claims Act. The Government also asserts that Defendants have failed to meet their burden of showing that they have a substantial need for these emails or have been unable to secure their equivalent by other means.

### 2. *Analysis*

The Court is not in a position to determine the Government's claim of work product without actually reviewing the emails in question.  See, In re Grand Jury Subpoena, 318 F.3d 379, 386 (2nd Cir. 2003) (collecting cases) (submitting documents for *in camera* review is "a practice both long-standing and routine" in cases involving claims of attorney client privilege and/or work product protection).  Perhaps recognizing this, the Government in its responsive brief requests, as an alternative to outright denial of Defendants' Motion to Compel, that  the Court review the subject emails *in camera*.  Docket No. 250 at 1.  In reply, Defendants assert that "[i]n an effort to conserve judicial resources, and in light of the solidified positions of the parties, Defendants believe an in camera inspection of these emails without further lengthy argument would best serve the judicial process."  Docket No. 269 at 1.  Accordingly, the Court will defer ruling on the Motion to Compel at this time, and the Government shall submit the disputed emails to the Court for an *in camera* review.

## IV.  CONCLUSION AND ORDER

On the basis of the foregoing, the Court hereby rules as follows:

(1) The United States' Consolidated Motion to Compel Production of Electronic Documents and Responses to Interrogatories by Defendants (Docket No. 218) is GRANTED to the extent that the Defendants are to: (a) conduct an adequate search of their electronic systems for documents responsive to the United States' discovery requests; (b) certify that they have performed that search; and (c) produce any responsive non-privileged  electronic documents, and/or produce a log of any privileged documents.  Said search and production, however, is limited to electronic documents created on or before the December 31, 2005.

(2) Defendants' Consolidated Motion to Compel Discovery Related to HHS-OIG File 4-93-

00138-9 and to Reopen the Personal Deposition of Special Agent Christopher Covington (Docket No. 219) is GRANTED as follows: within 7 days of the date of entry of this Order, Defendants shall serve on the Government no more than 5 requests and/or interrogatories specifically directed to elicit responses related to: (a) any notes taken by Agent Covington regarding his efforts to locate, and the subsequent discovery of, the 4-93 File; (b) the notes of any phone calls Agent Covington made in his effort to locate or verify the existence or non-existence of that file, including any phone logs, or notes of conversations; (c) copies of any contact sheets anyone made regarding Agent Covington's efforts to locate the file or verify its existence; and (d) the identity of any person who informed or suggested to Agent Covington that the 4-93 File had been destroyed (as well as the identity of anyone that person relied upon). Within 7 days of service, the Government shall respond to those discovery requests. Additionally, Defendants will be allowed to reopen the personal deposition of Agent Covington for the limited purpose of inquiring about his efforts to locate that file, and the subsequent discovery of that file. The reopened deposition shall not exceed 2 hours. In all other respects, this Motion to Compel is DENIED.

(3) Defendants' Motion to Compel Responses to Interrogatories Served on the United States Attorneys' Office and the FBI (Docket No. 223) is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED with respect to interrogatories number 2-10, 13-17, and 21-24, and the Government shall either supplement its answers to those interrogatories within 10 days of this Order, or inform the Court that its is unable to do so within that same period, at which point the Court will hold a conference with counsel to schedule depositions of FBI agents regarding the standard policy and procedures in the local FBI office from 1993 to 2002. The Motion is DENIED with respect to interrogatories 34-36 and 48.

(4) The Court DEFERS ruling on Defendants' Consolidated Motion to Compel Discovery of Certain Emails (Docket No. 237).  Within 10 days of the date of entry of this Order, the Government shall submit to the Court the subject emails for an *in camera* inspection.

(5) The parties shall comply with the foregoing deadlines, and, to the extent a specific deadline is not otherwise provided, all actions contemplated by this Order shall be completed within 30 days of entry of this Order.

It is SO ORDERED.

_____
E. CLIFTON KNOWLES
UNITED STATES MAGISTRATE JUDGE